So the first case we have today is PPG Industries versus the United States. And excuse me, I'm not pronouncing the name right. Is it Mr. LaGrotteria? LaGrotteria, Your Honor. That's right. Good morning, sir. Morning. Joseph LaGrotteria, K&L Gates on behalf of the appellant PPG Industries. I've asked for five minutes for rebuttal. Very well. Thank you, Judge. May it please the Court. This is a case that can only be analyzed in the context of how chrome chemicals during the time period in question, 1915 approximately to 1954, were processed from chrome ore. We know that natural products refining had this facility from approximately 1915 up through 1954. And at various times, even beginning as far back as World War One, the government had characterized chrome chemicals and chrome ore as strategic, very important materials for military purposes. The chrome chemicals that were the result of the processing of chrome ore were used in such events. Items as armor on tanks, aircraft parts, camouflage dye for clothing, tanning for soldiers' boots. There's no question. So let me ask you something. I think we have a pretty good grip on the fundamental facts here. Should we focus our attention on the control of the enterprise, as it were, or the control more specifically of the release of contaminants? The process itself was an inherently voluminous producer of hazardous waste. The chrome ore was brought in by the government to natural product refining. It was processed, as Your Honor is aware, through a leaching process to extract chrome. That liquid then went and was crystallized and repackaged to be sold. As Judge Respeca was asking, in this type of situation where we're trying to decide if the U.S. government or if a parent corporation should be responsible, is it control of the subsidiary or is it control of the subsidiary's disposal methods? The point here, Judge, is that, and what I was getting to, is that this is really not a question of disposal, because the whole process was one of hazardous waste generation, even during the process. Your position is you can't separate the two? Correct. And, in fact, the government recognizes that in its brief at pages four and five. It said that this process created voluminous amounts of waste mud, which were stored on the properties of natural product refining and leached into the soil. That's the very nature of the process. Chrome in, leachate, chrome waste. And as the government stated in joint exhibit 591, a 1944 chrome meeting, they were dealing with the issue of whether the production, how the production can change by not reworking the chrome more than once. Right. Because that would create a faster turnaround and better quality chrome chemicals. So you end up with more waste? Correct. And more toxic waste. And in that document, the government recognized two things. It was the practice of all these plants to store, dispose of this waste on site. And, in fact, there's a reference in dialogue in that same document where the government says, the question was posed by a different person in the meeting. How about answering this question for us? You make the argument, the key to your argument, as you say, is a standard to be applied should be the one adopted by this court and bank and FMC, as opposed to the language that was in the best foods decision of the United States Supreme Court four years later. Right. How do you make that argument? How does that argument survive? It seems like best food intervened here and that best food controls. And we seem to have said it controlled and let go. You do, Your Honor. And, quite frankly, if you do say you do decide that the best food language is what applies here, the result would be the same that PPG is asking for because the government did, in fact, manage, direct, and conduct the operations that in and of themselves were waste producing. So the operation was inherently toxic. Inherently toxic. No question about it. Everyone admits that. And this was not a case where, well, let's put some fluids or liquids, contaminated liquids in a lagoon in the lower 40. It went out the back door and it created piles, Your Honor, that were in some instances 70 feet high. 180, 170,000 cubic yards. I'm sorry. Isn't there a distinction between supervising activity that is waste producing and supervising the disposal of the waste that you have produced? Your Honor, there was no, in my view, no actual distinct disposal here. The Crowmore, after it was treated, was just piled on the property. Well, the disposal was non-disposal. Correct. It was not as if someone said let's put it on this truck and bring it here or let's pump this into a lagoon in the lower 40. It went out the door. There were piles that you saw from the exhibits. If you move those piles off site, you would need, if you use 14 cubic yard trucks, you would need 16,000 dump trucks to remove the two largest piles. But is the evidence all that clear? You know, what you're asking for here is you want us to overturn the district court's grant of summary judgment to the government and you want us to grant summary judgment to PPG and go back and fight out the amount of money. But is the evidence all that clear as to the control? I believe it is, Your Honor. In fact, we've gone through and you're well aware of the nine or ten items of activity the government did to control this facility. Let's be very clear. The district court says, let me define it. as opposed to the level of control they had in the FMC area with dealing with Rayon. I disagree. I don't believe that's correct, Your Honor. With all due respect to the district court, the district court said, well, you know, the government had a plant. Right. So Stouffer Chemical, I believe, supplied raw materials to FMC. Well, the raw materials were supplied by the government itself here, not some third-party chemical company. They cornered the market on the ore. And the question is control. Let's be very clear. If there was, if the natural products refining said, we don't want you to comply with your orders, your nine or ten items, what would happen? There would be, there's no problem in the universe for natural products refining to conduct its operations and sell to non-governmental defense contractors. So when you talk about control, there would be no natural products refining. Did the district court take the position for, did it even consider your argument that the entire enterprise was toxic and you couldn't separate one from the other? Well, it was certainly within our briefs, Your Honor, page 51, 52 in our main brief. We did not have our argument. We did not have the benefit of that to make these presentations. I mean, part of the problem, in my view, Judge, is that the district court kind of misconstrued best foods and looked at these facts through the following lens, that the operator must directly manage. That's not what best food, that's not what best food says. Best food says, as you're well aware, it says that the operator must manage, direct, or conduct operations. There would be no operations without the chrome being supplied by the government. And if natural products refining did not comply with those orders, including the process change. They weren't there from a day-to-day, from day-to-day. The government didn't have somebody on site up in Jersey City running these operations. They didn't need to, Judge, because they'd been running since 1915. In FMC, it was a completely new process. Yeah, they made the chromium ore available. It allowed them to buy the product. They were on the approved list of six. I think there were six at that time. But the government wasn't there day-to-day, and they weren't directing the operations, were they? Judge, there was no need to direct operations. Because, as I said, in FMC, it was a new process. They wanted to make sure that FMC was doing this new manufacturing process correctly. Here, they did not have to be there. As I said, it was a mature science. It was a mature process. There's textbooks that existed in the early 1900s on how to process chrome ore into chrome chemicals. So they didn't have to be there every day, Your Honor. They were there. They visited the site and saw the 70-foot piles. But, no, they did not need to be there because of the very nature of it. How often did they visit the site? Once a year. Even so, Judge, you only have to visit it once. To see those piles. Again, it wasn't a lagoon in the lower 40. They were seven stories high, Judge. And they knew that that was the chrome waste. No question about it. They knew it contained hexavalent chromium. So, Judge Fisher, I think that the evidence is clear. And there really can be no other conclusions that are drawn from it. I see that my time is almost up, and I will reserve my five minutes. Thank you. Is there a Mr. Braubender? How are you, sir? Good. Thank you. My name is Alan Braubender. I'm with the Department of Justice, and I'm here representing the United States. The United States is not liable as an operator under CERCLA. As interpreted by the Supreme Court in Best Foods, an operator is someone who directs, manages, or conducts, and I'm going to quote, operations specifically related to pollution. That is, operations having to do with the leakage or disposal of hazardous waste or decisions about compliance with environmental regulations, end quote. What do you make of counsel's argument that it's one and the same? You really can't separate control from control generally versus control over the toxic leakage. Well, I think, first of all, that's an argument that we haven't heard before today. Well, I'm asking. And I think that's true no matter what, no matter what industry. I think control of a product, if it's a product that produces hazardous waste, is control over the hazardous waste. I think that's true in every case. And so that's really a distinction, I think, without a difference. So you're agreeing that control means if you control the enterprise, you're also controlling the hazardous waste disposed from that enterprise? Well, I'm saying any product that produces hazardous waste. Which this did, right? Right. If you're controlling the manufacturing process, you're in some ways. Controlling the release of toxins. Well, because then you have to make decisions about what to do with the hazardous waste. But it's the decisions about what to do with the hazardous waste that the Supreme Court has said makes one an operator, not decisions about the manufacturing process. Why is this case really any different than FMC? Well, FMC was sort of an extraordinary case where the government essentially seized near total control of the facility. Well, it seems like the government had virtual control of this. They totally cornered the market on the ore. They prescribed the entire processes. They set the price at which the end product could be sold. What more is there to do here? Well, the two facts that distinguish this case from FMC is, first of all, the government told the manufacturer in FMC to manufacture a different product. Here, natural products always manufactured chrome chemicals. But not in the quantities and the speed that the government required at the time, correct? That's correct. And the second fact, I think, and very importantly, in FMC, the government stationed a representative on site who essentially acted as CEO of the facility and had decisions about all matters of the facility, including presumably waste disposal. And I should add that FMC is really an outlier, even at its time. Both before FMC and after FMC, courts generally did not find the government to be liable. Nevertheless, FMC is still the law in this circuit. Well, it is inconsistent with. To the point that it is consistent with Best Foods. That's correct. And Best Foods was an apparent subsidiary case. This case is much closer to FMC than it is to Best Foods. Well, I mean, there isn't a different standard for operator depending on if it's a governmental entity or a nongovernmental entity. So the Best Foods standard applies even in this sort of case. Now, after five years of discovery, PPG uncovered not one shred of evidence that the United States directed operations specifically related to pollution. What do you make of Litko's language? They wrote that it should be a more expansive definition than just somebody at the control of the release of toxic chemicals. Well, I'm not exactly sure what portion of Litko you're referring to, Your Honor. In defining an operator, the Supreme Court employed broad passive language. An operator is one who is involved in operations having to do with the leakage or disposal of hazardous waste, not one who is involved in operations causing or leading to the disposal of hazardous waste. Right, that's correct. And the United States here made no decisions regarding what to do with hazardous waste. It made – what the government did here – Earlier you said it was one and the same. No, I was trying to draw a different – I was trying to say if that was the standard, then every manufacturer – I was trying to draw a distinction, Your Honor, between the – if I said that, that's not what I meant, Your Honor. What I was saying is what you have to control under best foods is the decisions about what to do with the hazardous waste. And here the United States made no decisions with respect to the chromium waste. Except for the decision to use a method of refining which created twice as much waste as the old method. Well, that's a recommendation that the government made, but that is not a recommendation that natural products follow. Well, if PP – if NR – whatever, NRC had not adopted that recommendation, the government would have taken over the facility, right? No. No, it was merely a recommendation, Your Honor. Is that a recommendation that you pay your taxes? No, I mean, it's a recommendation, and we know that natural products didn't follow the recommendation, and nothing happened to natural products. But they did follow the recommendation of using the method that created twice as much waste. No. No, they didn't. That's the whole point of our argument. The government made a recommendation to change production methods, but – And then production went up. Natural products said we were only going to switch if the government purchased the resulting waste sludge. And the evidence in the record says that – shows that the government expressly refused to buy the waste sludge, and thus nothing ever became of the government's recommendation. But production went up, which could not in such a manner that it is unlikely to have happened unless they started using the more wasteful method. No, that's not true. What the evidence in the record shows is that in the fourth quarter of 1944, production went up slightly. But if you look at that document, it shows the production for every chromium chemical producer during 1944 for each quarter. And what you see is that it goes up and down each quarter. So the fact that it went up in one quarter is not evidence of a long-term change in the manufacturing process. And in fact, in 1945, the evidence in the record shows that PPG didn't use all the ore allocated to it. If there is insufficient evidence to really understand what was going on at the time, whose burden is that to show who was responsible for the creation of the waste? Well, of course, this was decided at summary judgment, and PPG must show that there is no genuine dispute of material fact here. And that's – the district court found there's no dispute of material fact about whether or not the government controlled operations specifically related to pollution. There is just no genuine dispute of material fact. So the burden is on PPG to show what was really happening during this period, that we can only infer from various indices such as the amount of production? Well, at the summary judgment stage, yes, PPG must submit evidence showing there is a genuine dispute of material fact. And PPG failed because all of its evidence relates to this sort of general control theory under FMC, which, of course, is no longer the test. Are you arguing that there's a different standard to be applied to an operator as opposed to the standard to be applied to an owner? Well, yes, in some ways, because an operator, we know, is liable only for participation in certain activities. And the Supreme Court said those activities are those related to waste disposal, right? An operator is not liable if it controls the marketing at a facility or the labor relations at a facility. It has to be – What's the statutory foundation for that? I know you make that argument, but I can't find any distinction in CERCLA to treat operator and owners differently. What the Supreme Court said is that because of CERCLA's focus on environmental contamination, that an operator has to be limited to those persons who direct, manage, or conduct operations specifically related to pollution. And despite five years – But isn't that – I mean, don't we have to take – and that comes from Best Foods. But don't we have to take that into context of the Best Foods case in which there was an argument as to whether or not the parent had responsibility as opposed to here? You're trying to say that since – we know here that the government wasn't the owner of this site. We know that. Everybody agrees with that. The question is whether you're an operator. But aren't you stretching what Best Foods said applied to the parent to you as an operator and therefore making a distinction in your argument between what's covered – how you cover the two under CERCLA? And I don't see the distinction in the definitions. Well, that's true that the definition defines operator as someone who's operating, and that's not particularly helpful, right? That was why the Supreme Court took out Best Foods. And in the context of deciding whether a parent corporation could be directly liable as an operator, the Supreme Court limited the term operator to those that control pollution-related matters. But a parent is different than the government coming in and imposing its will on a company, isn't it? Well, right, but there's only one – CERCLA does not distinguish between non-governmental operators and governmental operators. There's only one operator. There's a fashion distinction. True, but again, the Supreme Court said that to operate a facility means to conduct, direct, or manage operations specifically related to pollution. And despite five years of discovery, PPG uncovers not one shred of evidence that the United States conducted, directed, or managed operations at the natural products facility related to pollution. You don't raise sovereign immunity at all? We do not. And why is that, particularly because this claim involves government's activities during the time of war, during the time of two wars? Well, I think the FMC case addressed sovereign immunity and at least that portion of FMC. Well, I dissented in FMC. You did. We felt that it was an important issue whether there was sovereign immunity. Correct. And that sovereign immunity, in effect, is connected with the definition of operator and whether the government was an operator or not an operator. And if you're claiming the government was not an operator under FMC, shouldn't you claim that you have sovereign immunity? I think you and your dissenting colleagues in FMC, Judge Roth, didn't connect those two specifically. I think you found that there was no waiver of sovereign immunity and that the government was not an operator based on the facts of the case. And I think you and your dissenting colleagues were proven correct when the Supreme Court decided best foods. We always like to think we're proven correct. One thing or another as the years go by. Correct. And so, and again, that just shows that FMC case is really sort of an outlier, right? It may be an outlier some places, but it's not an outlier here. It was at least before best foods. It was not an outlier here. But again, I think the control, the general control standard on which FMC was based is no longer good law. And the court should apply the best foods. For an operator. For an operator, as this court did in the Lincoln decision. All of PPG's evidence relates to its FMC theory of general control. So the importance of chromium to the wars is immaterial under best foods. The government's activities regulating the wartime economy such as price controls or allocation controls or distribution controls is irrelevant under best foods. The government's status as a seller of chromite ore or purchaser of end products containing chromium is inconsequential under best foods. And the mere existence of seizure authority has no relation to the handling or disposal of waste. And there's not even a possibility here because the record shows the prerequisites of the government's power were never invoked. In the end, there's no evidence that PPG offered under the relevant best foods standard and the district court properly granted summary judgment to the United States. And we ask this court to refer. Thank you, sir. Just a few things. What the government does is two things in terms of their activities. Site one, it takes this position that the district court adopted this, that these items individually don't add up to control. So in a total totality, the circumstances do. Second point, these were not voluntarily complied with. There would be no NPR if they didn't get chrome and they wouldn't get chrome or if they didn't listen to the government. As to the change in process, there was a question about the records being destroyed. Not in there. I direct your attention to Joint Exhibit 668-69. What is it you want us to do? Do you want us to send this back and let a jury determine the control issue? Well, this would be a bench trial, Your Honor. I'm sorry, you're right. Yeah, but in any event, I think you have it within your wherewithal. If you want to apply best foods, you could seek, you could give PPG the relief it's seeking under best foods because of the government's involvement with this particular type of process. And at a minimum, I think that I would have loved to have the opportunity to present oral argument for the trial court and present evidence and have experts testify about documents and processes. Thank you. Thank you, gentlemen. Thanks for your argument and your briefs. We will take this case under advisement. Have a good day.